Robert Joseph MATHIS, Petitioner,

v.

Mary BERGHUIS, Respondent.

No. Civ. 00–40249.

United States District Court,
E.D. Michigan,
Southern Division.

April 29, 2002.

Valerie R. Newman, State Appellate Defender Office, Detroit, MI, for Robert Mathis, petitioner.

Vincent J. Leone, Michigan Department of Attorney General, Lansing, MI, for Mary Berghuis, Warden, respondent.

## OPINION AND ORDER

GADOLA, District Judge.

Before this Court is Magistrate Judge Thomas A. Carlson's report and recommendation that the Court deny Petitioner's motion for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 [docket entry 23] and Petitioner's objections thereto [docket entry 24]. Inexplicably, Respondent has not filed a timely response to Petitioner's objections. Pursuant to Local

Rule 7.1(e), the Court concludes that a hearing would not aid in the disposition of this matter. For the reasons set forth below, the Court rejects the Magistrate Judge's report and recommendation and concludes that Petitioner's § 2254 motion must be granted.

## I BACKGROUND

The following is the background of events essentially as delineated in Magistrate Judge Carlson's report and recommendation. No party challenges the Magistrate Judge's rendition of the factual and procedural background.

A jury of his peers convicted Petitioner of two counts of first-degree criminal sexual conduct [1] for the oral and vaginal violation of the complainant in this case. Petitioner is incarcerated pursuant to that conviction.

At trial, the essential evidence against Petitioner consisted of the following. The complainant testified that she and a friend of Petitioner's went to Petitioner's house on August 25, 1994 at roughly 2:30 a.m., after she had met Petitioner in a saloon earlier that evening. (R & R at 2.) The complainant testified that she went to Petitioner's house because she understood that a friend of hers was there. (R & R at 2.) Upon arrival, however, the complainant testified that she realized that her friend was not actually in Petitioner's home. (R & R at 2.) The complainant testified that she then attempted to leave, but Petitioner and his friend blocked her path and violated her vaginally and orally for roughly thirty minutes. (R & R at 2.) The complainant then testified that she ran crying from Petitioner's house to her auto. (R & R at 2.)

A neighbor corroborated the latter proposition, testifying that: he saw the complainant leaving Petitioner's house; the complainant was crying hysterically; and, the complainant was saying to Petitioner, whom the neighbor specifically identified as "Bob," words to the effect that "you shouldn't have done it." (TT [2] II at 111–13.)

The complainant called police from her home at roughly 4:00 a.m. and filed a police report. (R & R at 2.) The police officer involved testified that the complainant was "very upset, crying and rocking herself back and forth" during her interview with police. (R & R at 2.) After her interview with police, the complainant was examined at a hospital and a rape kit was prepared. (R & R at 2.) The complainant was agitated at the hospital, and required medication and counseling. (R & R at 2.) There was, however, no physical evidence indicating that the complainant had been raped. (R & R at 2–3.)

A policeman testified to the following. Petitioner admitted that he and his friend had been at the same bar as the complainant on the night in question. Petitioner denied, however, ever meeting the complainant. Instead, Petitioner claimed that he left the bar without the complainant, and that he spent the night at his mother's home. Moreover, according to the policeman's testimony before the jury, Petitioner told police that he had never been to his house on the evening in question. (R & R at 3.)

After hearing the evidence discussed above, the jury convicted Petitioner of two counts of first-degree criminal sexual conduct. On September 22, 1995 the trial court sentenced Petitioner to two concurrent terms of eight to twenty years' imprisonment. Petitioner presents this Court with a motion for the writ of habeas

---

1. M.C.L. 750.520b.

2. "TT" designates trial transcripts from Petitioner's August, 1995 trial.

corpus pursuant to 28 U.S.C. § 2254. Petitioner makes several arguments.

Petitioner's first, and dispositive, contention is that pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution violated the Fourteenth Amendment's Due Process Clause by failing to disclose exculpatory evidence, thus necessitating that the State vacate his conviction and release him or grant him a new trial. Petitioner has exhausted his state remedies regarding his *Brady* claim. On February 28, 2002, Magistrate Judge Carlson issued the report and recommendation at bar. In it, the Magistrate Judge urges, *inter alia*, that this Court reject Petitioner's *Brady* argument.

## II ANALYSIS

■ The Court reviews de novo the parts of a Magistrate Judge's report and recommendation to which a party has objected. *Key v. Grayson*, 163 F.Supp.2d 697, 702 (E.D.Mich.2001) (Gadola, J.). The Court must grant Petitioner's motion pursuant to § 2254 only if the state court's adjudication of Petitioner's claims on the merits:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

Under § 2254(d)(1), this Court may only grant Petitioner's motion if the state court arrived at a conclusion opposite to that reached by the U.S. Supreme Court on a question of law or if the state court decided the case differently than the U.S. Supreme Court has on a set of materially-indistinguishable facts. *Friday v. Straub*,

175 F.Supp.2d 933, 936 (E.D.Mich.2001) (Gadola, J.) (discussing *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Because this Court concludes that the state courts' rejection of Petitioner's *Brady* argument violated § 2254(d)(1) by applying unreasonably clearly-established federal law, this Court shall grant Petitioner's motion.

■ The Due Process Clause of the Fourteenth Amendment requires that a state may not "deprive any person of life, liberty, or property, without due process of law." The Supreme Court has established clearly that the Due Process Clause requires a state prosecutor to disclose evidence favorable to the defendant in a criminal case if that evidence is material to guilt or sentencing. *See Brady*, 373 U.S. at 87, 83 S.Ct. 1194. A petitioner establishes that the prosecution violated this duty when he proves that: (1) the relevant evidence was favorable to him; (2) the state suppressed the evidence; and (3) he suffered prejudice because of that suppression. *Jamison v. Collins*, 100 F.Supp.2d 647, 673 (S.D.Ohio 2000) (discussing *Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). Petitioner must establish each of these elements by a preponderance of the evidence. *Weeks v. Jones*, 26 F.3d 1030, 1047 (11th Cir.1994).

After trial, Petitioner learned of the evidence upon which he bases his *Brady* argument. This evidence consists of two police reports detailing previous complaints that the complainant made to police. These reports are attached to Petitioner's brief as exhibit E.

The first of these reports is from 1988 and involves a complaint of rape that the complainant made to the City of Warren Police Department. The police report relates the following information. The complainant told police that, early on August 27, 1988, a man forced her into his auto,

drove her to the rear of a factory parking lot, and committed acts of battery and rape that culminated in the attacker's ejaculation.[3] The alleged attacker then released the complainant, who proceeded to look for her boyfriend. When she found her boyfriend several hours later, the two of them went to his house and went to sleep.

After the complainant awoke, she contacted police and described the above events. Police interviewed her and the complainant then selected a "mug shot" of a man who looked similar to the man who allegedly raped her.[4]

A physician's examination was conducted on the complainant on the same day of the alleged attack, as was a rape kit. The physician's examination returned "negative results." The rape kit indicated that there was "no evidence of semen" because "the swab was not used from the rape kit." Police also collected the clothing that the complainant wore on the day of the alleged rape, but that evidence also did not show evidence of semen.

On August 29, 1988, the detective assigned to the case spoke with the manager of the factory whose parking lot allegedly was where the rape occurred. That manager revealed that "the gates [to the parking lot] were closed and locked promptly at 18:30 hours on Friday, August 26, and that it would have been impossible for a car to drive to the rear of the factory without unlocking those gates as [the complainant] had reported. Further, [the detective] personally examined said gates on the date of occurrence [August 27] and again on the 29th of August and determined that there was no visible sign of any forced entry or damage to the gate or lock."

On August 31, 1988 the complainant had an appointment with the detective, but "failed to appear," claiming that she could not get a ride to the police station. The detective told the complainant to arrange for transportation and a new appointment would be set. From that date until September 26, the complainant and detective exchanged telephone messages but were not able to set an interview time.

Finally, on September 26, 1988, the complainant called and arranged an interview with the detective for September 28. The detective's entry from September 28 is as follows:

"[The complainant] appeared this date and looked at several additional photographs of possible suspects in this matter with negative results. [The complainant] did indicate that she saw a vehicle and suspect matching the description of the alleged rapist in this matter in the area of Eight Mile and Gratiot on Monday, 9–26, at approximately 01:30 Hrs. She indicated there was no license plate on the car and that the friends that she was with would not follow the car to determine its destination or to attempt to identify the driver. In addition it should be noted that [the complainant] failed to bring this information to my attention until nearly 48 hours later at our interview. [The complainant] was advised that she appeared to be disinterested in the investigation and further that if there were no further leads in the very near future, that the case would be closed. [The complainant] seemed to be quite indifferent with [sic] this information and the interview was terminated."

The penultimate entry in the police report is from October 12, 1988 and states that "[t]here being no further contact from the complainant and no additional leads in this investigation, undersigned requests

---

3. The Court regrets having to put such a delicate subject so bluntly.

4. Police never found the man identified in the mug shot.

this case be closed, code 06." Shortly thereafter, the case was closed.

The second police report to which Petitioner points is from 1992 and involves the complainant's assertion that she was the victim of an armed robbery. This police report revealed that the complainant stated that, while she was walking in an alley near her home, a man produced a gun, threatened to kill her, and demanded her leather jacket. According to the complainant, the robber took her jacket and she dropped a package as she ran from him. The pregnant part of the investigating officer's report is as follows:

> After I cleared the scen [sic] I returned to the alley where [the complainant] stated she had been robbed. Snow was fresh and I felt the suspect could have left foot prints which would have been valuable evidence. Investigation did in fact show foot prints in the fresh snow. I found the prints to be small and appeared to be a womens [sic] print. I located no other prints in the snow. These prints were so fresh I could read the writing from the sole of the shoe in the snow which stated "The Winner". These prints led to the rear of a Michigan Bell transmitter where I found [the complainant's] coat and package had been placed. There were no other footprints and I'm sure a suspect would have left prints. It appeared [the complainant] had placed the items behind the box, because I noticed entrance and exit prints. . . . we returned to [the complainant's] home to question her further about the robbery. I read Miranda Warnings via card and [the complainant] stated she understood the rights and was willing to speak with us. [The complainant] stated she was telling the truth, but became very nervous. I asked to see the soles of the shoes she was wearing and they were the same shoe with "The Winner" stamped across the bottom.

Shortly thereafter, police closed the investigation.

The Court now turns to the question of whether Petitioner has established a *Brady* violation.

### A. Was the relevant evidence favorable to Petitioner?

■ As is palpable from the above discussion of the police reports, a reasonable jury probably would conclude that the complainant had lied to police about both the alleged 1988 rape and the alleged 1992 armed robbery. As to the former document, a reasonable jury would likely conclude that the complainant had lied about the rape in 1988 because: (1) the alleged location of the attack, according to all of the evidence discussed in the police report, was inaccessible at the time of the alleged rape; (2) evidence technicians found no physical evidence of rape, despite the complainant's assertion that the rapist had ejaculated; (3) the complainant appeared to take little interest in the investigation, according to the report; and (4) the complainant provided minimal cooperation to police. Buttressing the latter conclusion is that the complainant claimed to have spotted her attacker on September 26, 1988, but failed to report this sighting to police for more than two days. A reasonable jury probably would conclude that the preceding four factors are more consistent with a false allegation of rape than with a rape in actuality. Regarding the 1992 report of armed robbery, the investigating officer all but declares that the complainant lied about being the victim of this violent felony. A reasonable jury likely would, upon reading the 1992 report, reach the same conclusion.

Documentary evidence that an alleged rape-victim has lied previously about being the victim of a violent crime, and especially about being raped, is obviously favorable

to a defendant charged with rape, especially where, as here, the only direct evidence of the crime is the complainant's testimony. *Cf. State v. Cardall,* 982 P.2d 79, 86 (Utah 1999) (reasoning that "if the records show that S.F. previously lied about an attempted rape by a school janitor, this is evidence which might have been material to Cardall's defense"); *People v. Mikula,* 84 Mich.App. 108, 269 N.W.2d 195, 198–99 (1978) (reasoning that "where the verdict necessarily turned on the credibility of the complainant, it is imperative that the defendant be given an opportunity to place before the jury evidence so fundamentally affecting the complainant's credibility"). The Court thus holds that Petitioner has proven the first element of a *Brady* violation.

### B. Did the state suppress the evidence?

■ The word "suppress" in this context is somewhat misleading. As Magistrate Judge Carlson aptly observed, "it is not relevant whether the prosecutor actually *knew* the information existed. The duty to disclose exculpatory information extends to information in the possession of the prosecutor's office or in the possession of the law enforcement agency responsible for investigating the offense, such as the police." (R & R at 8 (emphasis in original).) This is a concise and correct statement of the law. *See Kyles v. Whitley,* 514 U.S. 419, 433–38, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Here, it is undisputed that the police possessed the two reports in question, and that the prosecution did not discover and disclose those reports to Petitioner's counsel before trial. The Court therefore holds that Petitioner has proven the second element of a *Brady* violation.

### C. Was Petitioner prejudiced?

■ To establish prejudice, Petitioner must prove that, as Magistrate Judge Carlson correctly noted, "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 433–34, 115 S.Ct. 1555. A "reasonable probability of a different result," in this context, means that the overall effect of the undisclosed evidence would undermine confidence in the trial's outcome. *Jamison,* 100 F.Supp.2d at 673 (citing *Kyles,* 514 U.S. at 434–35, 115 S.Ct. 1555).

The Court must first determine whether the 1988 and 1992 reports would have been admissible at trial.[5] *Cf. United States v. Phillip,* 948 F.2d 241, 250 (6th Cir.1991) (concluding that there was no prejudice under *Brady* where the evidence was inadmissible). *But cf. Johnson v. Nagle,* 58 F.Supp.2d 1303, 1364 (N.D.Ala.1999) (reasoning that "the admissibility of the material in question is not dispositive of whether it is exculpatory"). The Court turns first to the 1988 police report concerning the complainant's accusation of rape.

■ Under the law of Michigan as established at the time of his trial, Petitioner "should [have been] permitted to show that the complainant had made false accusations of rape in the past." *People v. Hackett,* 421 Mich. 338, 348, 365 N.W.2d 120 (1984). As discussed above, the 1988 report was evidence from which a reasonable jury probably would infer that the complainant had made a false accusation of rape in the past. Therefore, had the prosecution properly turned over the 1988 report to defense counsel, such evidence would have been admissible at trial. As the Michigan Supreme Court reasoned in *People v. Wilson,* 170 Mich. 669, 137 N.W.

---

**5.** The Court also observes that, had Petitioner known of the police reports in question, his counsel likely would have attempted to elicit further exculpatory evidence or testimony from the officers who wrote those reports.

92 (1912), a defendant has a right to offer independent evidence of the complainant's history of making false accusations of rape against other men. *Id.* at 93.[6]

■ At the very least, this evidence would have been admissible for impeachment. Petitioner had a right to cross examine the complainant regarding prior false accusations "of a similar nature," and, if she were to deny making such a false accusation, Petitioner would have been entitled to submit into evidence extrinsic proof of such a charge in order to impeach the complainant. *Mikula,* 269 N.W.2d at 198–99. *See generally Boggs v. Brigano,* No. 94–4000, 1996 WL 160822, at **10–12 (6th Cir. Apr.4, 1996) (Rosen, J., writing separately) (discussing the importance of admitting evidence of a prior false accusation of rape). The Court thus concludes that the 1988 report of rape would have been admissible at trial as evidence of a false accusation "of a similar nature," at least for the purpose of impeaching the complainant.

The Court turns to the 1992 report of armed robbery. As discussed above, Petitioner had a right to cross examine the complainant regarding prior false accusations "of a similar nature," and, if she were to deny making such a false accusation, Petitioner would have been entitled to submit into evidence extrinsic proof of such a charge. The question thus becomes, was the 1992 accusation of armed robbery "of a similar nature" as the complainant's 1994 accusation of rape?

The Court is aware of no case in which a Michigan court has held that armed rob-

bery is, or is not, "of a similar nature" to rape. Precedent, or history, if you will, having failed to serve as an aid, the Court turns to the method of logic by analogy in order to answer the question at hand. *See generally* Benjamin N. Cardozo, *The Nature of the Judicial Process* 30–31 (1921).

Under the law of Michigan, breaking and entering into an occupied dwelling is a "violent" offense. *See People v. Kohler,* 113 Mich.App. 594, 318 N.W.2d 481, 482 (1982). Yet, in *People v. Townsend,* 60 Mich.App. 204, 230 N.W.2d 378 (1975), the Court of Appeals of Michigan reasoned that even a non-violent crime could be "of a similar nature" to the violent crime of breaking and entering an occupied dwelling. *People v. Penn,* 71 Mich.App. 517, 248 N.W.2d 602, 604 (1977) (Brennan, J., dissenting) (discussing *Townsend* ). It follows that the term "of a similar nature" has a rather elastic meaning under the criminal law of Michigan.

In this case, the 1992 accusation of armed robbery and the 1994 accusation of rape are similar in that both alleged that the complainant suffered a violent assault, while alone, without any other witness to the crime. In light of the expansive meaning that Michigan courts have given the term, this Court holds that the 1992 armed-robbery accusation was "of a similar nature" to the 1994 rape accusation and would thus have been admissible at least for impeachment.

Having concluded that the evidence in question would have been admissible at trial,[7] the Court turns to the last issue *sub*

---

**6.** Although the Michigan Supreme Court decided *Wilson* before the advent of Michigan's rape-shield statute, M.C.L. 750.520(j)(1), *Wilson* remains good law because *Wilson* concerns the admissibility of evidence that the complainant made false accusations of rape in the past, and not evidence of the complainant's sexual history. *See People v. Garvie,* 148

Mich.App. 444, 448, 384 N.W.2d 796 (1986) (citing *Wilson* ).

**7.** The Court rules that the evidence in question would have been admissible under Michigan law. The Court therefore need not address Petitioner's argument that, regardless of Michigan law, the evidence would have been

*judice:* whether the overall effect of the undisclosed evidence undermines confidence in the trial's outcome. For the following reasons, the Court answers this question in the affirmative.

In this case, the only direct evidence of Petitioner's guilt was the complainant's testimony to the effect that Petitioner and a co-defendant had raped her. There was, moreover, utterly no physical evidence of rape. In such circumstances, evidence that the complainant had a history of falsely reporting that she was the victim of violent crimes—including a rape—would have been extraordinarily material to the defense. *See Boggs,* 1996 WL 160822, at **10–12 (Rosen, J.) (writing separately). As Professor Clifford S. Fishman has aptly put it, "[a] false rape accusation reveals a flaw in character of a particular, and particularly dangerous, kind. Its relevance, in a case where the key question is whether the complainant is lying about rape this time, is palpable." Clifford S. Fishman, *Consent, Credibility and the Constitution: Evidence Relating to a Sex Offense Complainant's Past Sexual Behavior,* 44 Cath. U.L.Rev. 709, 776–77 (1995) [hereinafter Fishman].

In short, the evidence that the prosecution failed to disclose was so important to Petitioner's defense that its suppression undermines confidence in the trial's outcome; i.e., the proceeding probably would have had a different result had this evidence been disclosed timely to Petitioner. Accordingly, this Court holds that Petitioner has satisfied the third and final element of a *Brady* violation.

■ Magistrate Judge Carlson reached the opposite conclusion as to the third element of a *Brady* violation, and his

thoughtful analysis of the matter warrants discussion. Magistrate Judge Carlson reasoned that "because Petitioner has offered no proof that these prior allegations, and the rape allegation in particular, were false, the evidence is not material and he is unable to demonstrate that the prosecutor violated [the Fourteenth Amendment's Due Process Clause as discussed in] *Brady* or that he was deprived of a fair trial." (R & R at 9.) In other words, according to Magistrate Judge Carlson, Petitioner failed to demonstrate prejudice because he failed to present proof that the previous allegations were untrue. This Court respectfully disagrees with Magistrate Judge Carlson on this point.

Petitioner has, in this Court's estimation, offered proof that the 1988 and 1992 reports were false. "Proof" is, *inter alia,* "[a]ny fact or circumstance which leads the mind to the affirmative or negative of a proposition." *Black's Law Dictionary* 1215 (6th ed.1990). In most rape cases, proof "of prior accusations without more may [not] support the inference that the prior complaints were probably false." Fishman, *supra,* at 773–74. Typically, a defendant will attempt to prove the falsity of a prior accusation by showing that the complainant later recanted. *Id.* at 773; *see, e.g., Wilson,* 137 N.W. at 92. Merely showing that the complainant's earlier accusation did not lead to an arrest, that the charges were dropped, or that the defendant was acquitted usually does not, however, suffice to prove that a prior allegation was false. Fishman, *supra,* at 774.

This is an atypical case. Petitioner puts forth no evidence that the complainant ever recanted either of the two allegations

admissible because the Confrontation Clause grants Petitioner a right to explore the complainant's potential history of having made a false allegation of rape. The Court notes, however, that there is authority that seems to

suggest an affirmative answer to that question. *See Lemmon v. Ohio,* No. 5:01 CV 0156, 1992 WL 551565, at *1 (N.D.Ohio Feb.19, 1992), *aff'd,* 1993 WL 15164.

in question. Petitioner does not, on the other hand, contend merely that the prior accusations were false because the complainant's earlier accusation did not lead to an arrest, the charges were dropped, or the defendant was acquitted. Rather, on pages eight through twelve, and twenty-three through twenty-four, of Petitioner's brief, Petitioner discusses the same aspects of both police reports that this Court discussed above and that have led this Court to conclude that a reasonable jury, reading both reports, would likely find that the complainant lied about both the alleged rape in 1988 and the alleged armed-robbery in 1992. Thus, Petitioner has, in fact, presented facts and circumstances that lead the mind to conclude that the prior accusations were false; i.e., Petitioner has offered proof that the previous reports were untrue.

In short, Petitioner has established a *Brady* violation. The "remedy for a *Brady* violation is a new trial." *United States v. Presser*, 844 F.2d 1275, 1286 (6th Cir.1988). The parties have not provided briefing, however, on the matter of how soon Petitioner would be entitled to a new trial in the event that this Court were to grant his motion pursuant to § 2254. This Court, moreover, is unaware of authority governing the subject.

Nonetheless, logic seems to dictate a balancing of interests in these circumstances. On one hand, the State needs time to decide whether to appeal this ruling and, in the event of an unsuccessful appeal, or no appeal at all, the State would require time to prepare for trial. On the other hand, Petitioner's interest in a speedy trial, and the possible acquittal a new trial brings, is obvious: prison is not always a desirable place to live. *See* Matthew J. Hank, *District Court Review of a Magistrate Judge's Pretrial Detention Order*, 33 UWLA L.Rev. 157, 160 (2001). With those factors in mind, the Court

turns to analogous authority in order to decide how quickly Petitioner must have a new trial.

In *Young v. Hofbauer*, 147 F.Supp.2d 724 (E.D.Mich.2001), the Honorable Arthur J. Tarnow granted the petitioner's motion pursuant to § 2254 and granted a new trial within ninety days. *Id.* at 733. In *Young*, as in this case, roughly seven years had passed between the petitioner's conviction of a violent crime and this Court's conclusion that the petitioner was entitled to a new trial. *Id.* at 727. It therefore stands to reason that, if ninety days were an appropriate period of time for the petitioner to remain in prison while the State weighed its options and possibly prepared for a new trial in *Young*, ninety days should suffice in this case as well. This Court, accordingly, shall order that the State afford Petitioner a new trial beginning within ninety days of entry of this order, or release him from custody without conditions.

The Court is aware that this remedy may exact a heavy toll on the complainant. The Court regrets that necessity, but offers three thoughts on the matter.

First, all that this Court is saying is that the prosecution did not disclose exculpatory evidence, and that this evidence probably would have led a jury to have reasonable doubts as to Petitioner's guilt. The Court emphatically is NOT saying that it thinks the complainant was not raped. The Court has no opinion as to that issue. Instead, assuming that the State elects to retry Petitioner, a jury of Petitioner's peers, in light of both the inculpatory *and* exculpatory evidence, will have to decide whether Petitioner raped the complainant.

Second, this situation could have been avoided had the prosecution met its constitutional duty under *Brady*. The responsi-

bility for this predicament lies not with the Court, but with the prosecution.

Finally, the Court notes that

> [s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts."

*Brady,* 373 U.S. at 87, 83 S.Ct. 1194. As the undersigned has stated previously, although "it may be popular for detractors to criticize the courts for granting relief based on apparent 'technicalities,' defenders of our system of justice know that the rights guaranteed by the Constitution are never mere technicalities. Here, upholding those rights requires vacating Petitioner's conviction and granting him a new trial." *Tyler v. United States,* 78 F.Supp.2d 626, 633 (E.D.Mich.1999).

## III CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Petitioner's motion for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **GRANTED.**

**IT IS FURTHER ORDERED** that Petitioner's conviction and sentence are **VACATED.**

**IT IS FURTHER ORDERED** that the State of Michigan shall either (1) set a new trial date that is within ninety days of entry of this order or (2) release Petitioner unconditionally.

**SO ORDERED.**